IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF OHIO
WESTERN DIVISION AT DAYTON

KEMPER MORTGAGE, INC.,

      Plaintiff,               :        Case No. 3:06-cv-042

   -vs-                                       Chief Magistrate Judge Michael R. Merz
                                   :

JEFFREY P. RUSSELL,

      Defendant.

**DECISION AND ORDER GRANTING PLAINTIFF'S MOTION FOR PRELIMINARY INJUNCTION**

       This case is before the Court on Plaintiff's Motion for Preliminary Injunction (Doc. No. 40; corrected as to transcript references at Doc. No. 52).  Defendant has opposed the Motion (Memorandum in Opposition, Doc. No. 47), and Plaintiff has filed a Reply in Support (Doc. No. 51). The Motion is supported by the transcribed evidence on Defendant's Motion to Dismiss (Doc. No. 19), the evidence presented on the Motion for Temporary Restraining Order, and the transcribed evidence on the instant Motion (Doc. Nos. 41-44).

       The parties unanimously consented to plenary magistrate judge jurisdiction for the preliminary injunction motion and it was referred on that basis by District Judge Rose under 28 U.S.C. §636(c) (Doc. No. 28).  After the hearing on the Motion but before filing of this Decision, the parties unanimously consented to plenary magistrate judge jurisdiction for all purposes and the case was again referred on that basis (Doc. No. 57).

       The Court has subject matter jurisdiction of this matter by virtue of the diverse citizenship of the parties.  (Notice of Removal, Doc. No. 1)  The Complaint pleads claims for relief arising

1

under the law of Ohio.  Accordingly, the Court will base its decision on Ohio substantive law.  28 U.S.C. §1652; *Erie Railroad Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L. Ed. 2d 1188 (1938).  In applying state law, the Sixth Circuit follows the law of the State as announced by that State's supreme court. *Ray Industries, Inc. v. Liberty Mut. Ins. Co.*, 974 F. 2d 754, 758 (6th Cir. 1992); *Miles v. Kohli & Kaliher Assocs.,* 917 F. 2d 235, 241 (6th Cir. 1990). "Where the state supreme court has not spoken, our task is to discern, from all available sources, how that court would respond if confronted with the issue." *Id.; In re Akron-Cleveland Auto Rental, Inc.,* 921 F. 2d 659, 662 (6th Cir. 1990); *Bailey v. V & O Press Co*., 770 F. 2d 601 (6th Cir. 1985); *Angelotta v. American Broadcasting Corp.,* 820 F. 2d 806 (1987).  The available data to be considered if the highest court has not spoken include relevant dicta from the state supreme court, decisional law of appellate courts,  restatements of law, law review commentaries, and the "majority rule" among other States. *Bailey*, 770 F. 2d at 604. "Where a state's highest court has not spoken on a precise issue, a federal court may not disregard a decision of the state appellate court on  point, unless it is convinced by other persuasive data that the highest court of the state would decide otherwise." *Puckett v. Tennessee Eastman Co.*, 889 F.2d 1481, 1485 (6th Cir.1989); *accord Northland Ins. Co. v. Guardsman Products, Inc*., 141 F.3d 612, 617 (6th Cir.1998). This rule applies regardless of whether the appellate court decision is published or unpublished. *See Talley v. State Farm Fire & Cas. Co.*, 223 F.3d 323, 328 (6th Cir.2000); *Puckett,* 889 F.2d at 1485; *Ziegler v. IBP Hog Market*, 249 F.3d 509, 517 (6th Cir. 2001).

On the other hand, if "a rule really regulates procedure, -- the judicial process for enforcing rights and duties recognized by substantive law and for justly administering remedy and redress for disregard or infraction of them," then the federal procedural law, including the Federal Rules of Civil Procedure will apply regardless of the basis of jurisdiction. *Sibbach v. Wilson*, 312 U.S. 1, 14, 61 S. Ct. 422, 85 L. Ed. 479 (1940).  Allocation of the burden of proof is a matter governed by state

law.  *Safeco Ins. Co. of America v. City of White House, Tennessee*, 191 F. 3d 675 (6th Cir. 1999). However, the Court has been unable to find relevant case on the question whether the quantum of proof needed is to be considered substantive or procedural under *Erie Railroad*.  Ohio law requires that entitlement to a preliminary injunction be shown by clear and convincing evidence. *Mead Corp. v. Lane*, 54 Ohio App. 3d 59,  560 N.E.2d 1319, (Ohio App. 4th Dist. 1988)(Whiteside, J.).  Out of an abundance of caution, the Court will make findings of fact herein only when it concludes they have been proven by clear and convincing evidence.

This Decision embodies the Court's findings of fact and conclusions of law as required by Fed. R. Civ. P. 52.

The factors to be considered in determining whether to issue a preliminary injunction are

1) Whether the plaintiffs have shown a strong or substantial likelihood or probability of success on the merits;

2) Whether the plaintiffs have shown irreparable injury;

3) Whether the issuance of a preliminary injunction would cause substantial harm to others;

4) Whether the public interest would be served by issuing a preliminary injunction.

*Nightclubs, Inc. v. City of Paducah,* 202 F. 3d 884, 888 (6th Cir. 2000); *Washington v. Reno,* 35 F. 3d 1093, 1099 (6th Cir. 1994); *NAACP v. City of Mansfield*, 866 F. 2d 162, 166 (6th Cir. 1989); *Frisch's Restaurant, Inc. v. Shoney's, Inc.*, 759 F. 2d 1261, 1263 (6th Cir. 1985);  *In re DeLorean Motor Co*., 755 F. 2d 1223, 1228 (6th Cir. 1985).  These four considerations are "factors to be balanced, not prerequisites that must be met.  Accordingly, the degree of likelihood of success required may depend on the strength of the other factors." *DeLorean*, 755 F. 2d at 1229.  The four

considerations are factors to be balanced, not prerequisites that must be met. *Mich. Bell Tel. Co. v. Engler*, 257 F. 3d 587, 592 (6th Cir. 2001). Although no one factor is controlling, a finding that there is no likelihood of success is usually fatal. *Gonzales v. Nat'l Bd. of Med. Exam'rs,* 225 F. 3d 620, 625 (6th Cir. 2000).

**1.     Substantial likelihood of success on the merits:**

Plaintiff claims that Defendant has misappropriated its trade secrets and has used and will continue to use them in direct competition; it seeks to have him enjoined during the pendency of this action from further competing.

Plaintiff Kemper Mortgage, Inc., is in the mortgage loan business, providing brokerage and lending services. It has approximately 200 employees working in residential real estate markets in Ohio, Colorado, Illinois, Nevada, Florida, and Arizona. Kemper opened a Denver, Colorado, office in 2002.

Kemper employed Defendant Jeffrey Russell in Miamisburg, Ohio, either on a direct employment or contract basis, beginning in 2004. From March 1 to May 1, 2005, Rusell was employed as an assistant to the director of operations in Miamisburg, but he could not be licensed in the mortgage broker business in Ohio because of a criminal conviction.

On March 3, 2005, Russell signed what was apparently a standardized Kemper Employment Agreement (Plaintiff's Exhibit 1). Therein he acknowledged that he was an employee-at-will (¶2). ¶4 provides:

> Non-disclosure of Employer's Confidential Information: Employee agrees and understands that Employer's customers, customer leads, loan programs and other information concerning Employer are confidential and proprietary. Employee agrees that in the event of a termination of Employee's employment with Employer, not to disclose to any third party. Employee further acknowledges and agrees that Employee's unauthorized use of such confidential

4

>information in competition with Employer or Employee's breach of the terms of this paragraph will be detrimental to the legitimate business interests of Employer and will cause irreparable injury to the conduct of Employer's business and will entitle Employer to legal relief and the entry of an injunction by a court of competent jurisdiction without the necessity of a bond, to enjoin Employee from such breach of this Agreement.

In ¶5 Russell promises not to "solicit, divert, take away, accept or hire away any employees, agents, or independent contractors of Employer" for a period of two years; this paragraph also contains a consent to injunctive relief.

Eventually Kemper decided to promote Russell to operations manager in the Denver office where the conviction would not prevent his working. The operations manager position was the highest level of management at the Denver office. In that capacity, Russell had over-all responsibility for the office, including employee recruitment and sales and marketing efforts.

In his capacity as Denver operations manager, Russell attended a managers' meeting in Miamisburg on November 17-18, 2005. At that meeting he was privy to the long-range business plans for Kemper, including a new customer retention program and plans for the opening of new offices.

The testimony of various witnesses shows the mortgage broker business to be highly competitive, at least in the markets discussed at the hearing; for example, witnesses estimated the number of mortgage brokers in the Denver area alone to be approximately five thousand. There do not appear to be very high start-up capital barriers to entry and employment is very fluid with salespeople being discharged for short-term low productivity and/or voluntarily and readily changing jobs for slightly better pay.

Bankers Home Mortgage was, in the fall of 2005, in direct competition with Kemper in the Denver market, wholly owned by Rick Dennis, and not doing very well. Sometime in the fall of 2005, Dennis and Russell began negotiating for Russell to take over the Denver office of Bankers

5

with the same managerial responsibilities as he had for the Kemper office. The evidence proves beyond any doubt that Dennis and Russell agreed that Russell would take that position and bring with him many of the Kemper Denver employees, including at least Ken Ong, Matt Mansfield, Mark Magdaleno, Rich Tucker, and Julia Cordova. Aware of his obligation not to solicit Kemper employees, Russell, with Dennis' complicity, engaged in various ruses, including use of a Craigslist set of advertisements for positions at Bankers, to attempt to disguise what they were planning. To induce Dennis to accept the plan, Russell created a business plan on a spreadsheet for the proposed Bankers Denver office under his management which made use of a compensation structure for sales employees which was competitive with the Kemper compensation structure. To induce Russell to come to work for him and carry out the plan, Dennis offered Russell an attractive compensation package, including a $100,000 automobile if Russell could recover Dennis' investment for him within a year.

  Defendant's argument that Kemper's confidential financial information was not used in creating this business plan because the "numbers are not the same" is transparently false: Russell knew the Kemper information and was planning on going into direct competition with Kemper on Bankers behalf. Of course one does not attempt to hire away people from a going concern to a new concern to do the same job by offering them the same compensation – one offers slightly more or at least the appearance of slightly more. And that is what the Russell plan for Bankers Denver shows.

  Russell's method of taking Kemper information with him displays the possibilities electronic culture allows for such behavior. A great deal of confidential Kemper information was downloaded by Russell, agglomerated into four electronic files labeled "Stuff, Stuff2, Stuff3, and Stuff4, and then emailed by him from his corporate account to his private account. At least one of these files is known to have reached Dennis personally, but Russell thereby also made them available to himself

6

for use in creating the new Bankers Denver operation and then after he became employed there.  In the pre-electronic culture, the copying would have taken much longer, but once done would have been easier to conceal; computer forensics uncovered and traced Russell's efforts.

Defendant argues that the Kemper Denver office was doing poorly and was probably going to be closed in any event.  The Court finds that most of the perception that Kemper Denver was doing poorly was created by Russell at a time when he was already conspiring with Dennis in breach of his duty of loyalty to Kemper.

During the preliminary injunction hearing, Plaintiff presented convincing evidence of intentional spoliation of evidence by Russell.  The day before this litigation commenced and under threat of its commencement, he caused to be installed on his laptop computer a program called "Window Washer" and thereafter caused to be activated a function of that program called "shredder" which prevents the forensic recovery of deleted electronic files by overwriting them.  Plaintiff's forensic expert, Greg Kelley, testified without contradiction that attempts were made on or before January 26, 2006, to access the email accounts of Jason Messer, Kemper's President, and David Van Horn, its controller.  On January 30, 2006, Messer's email was extensively spammed; Russell refused to answer questions about that at the hearing, invoking his Fifth Amendment privilege.  Plaintiff is entitled to the inference, which the Court makes, that considerably more evidence of misconduct would have been found without the spoliation.

Ohio Revised Code § 1333.61 provides:

As used in sections 1333.61 to 1333.69 of the Revised Code, unless the context requires otherwise:

(A) "Improper means" includes theft, bribery, misrepresentation, breach or inducement of a breach of a duty to maintain secrecy, or espionage through electronic or other means.

(B) "Misappropriation" means any of the following:

(1) Acquisition of a trade secret of another by a person who knows or has reason

7

to know that the trade secret was acquired by improper means;

(2) Disclosure or use of a trade secret of another without the express or implied consent of the other person by a person who did any of the following:

(a) Used improper means to acquire knowledge of the trade secret;

(b) At the time of disclosure or use, knew or had reason to know that the knowledge of the trade secret that the person acquired was derived from or through a person who had utilized improper means to acquire it, was acquired under circumstances giving rise to a duty to maintain its secrecy or limit its use, or was derived from or through a person who owed a duty to the person seeking relief to maintain its secrecy or limit its use;

(c) Before a material change of their position, knew or had reason to know that it was a trade secret and that knowledge of it had been acquired by accident or mistake.

(C) "Person" has the same meaning as in division (C) of section 1.59 of the Revised Code and includes governmental entities.

(D) "Trade secret" means information, including the whole or any portion or phase of any scientific or technical information, design, process, procedure, formula, pattern, compilation, program, device, method, technique, or improvement, or any business information or plans, financial information, or listing of names, addresses, or telephone numbers, that satisfies both of the following:

(1) It derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use.

(2) It is the subject of efforts that are reasonable under the circumstances to maintain its secrecy.

Kemper makes very broad claims to trade secret protection for its business information. Defendant in response points out a number of areas of such business information that are not confidential or unique to Kemper's way of doing business. As Defendant notes, some of Kemper's competitive information – e.g., the "Kemper Cup" standings – could be readily observed by anyone visiting the Kemper Denver offices. Obviously any of its promotional materials mailed to potential customers loses its confidentiality when mailed. However, the Court finds Kemper established at

8

the hearing that it has a protectible trade secret interest, as defined in Ohio Revised Code § 1333.61, in at least its customer retention program, in its customer leads, in its financial and marketing plans disclosed to Russell at the managers' meeting in November, 2005, and in the structure of compensation for its sales people.  In a sense, the confidentiality of this information can be inferred from methods used by Russell to package it for his re-use after he left Kemper.  More directly, Dennis admitted that much of the same kind of information, but as it relates to Bankers, is information kept confidential at Bankers.  In other words, Kemper is not a company obsessively keeping secret information which is otherwise widely shared in this industry.  Instead, it seems to be part of the mortgage broker industry culture to keep business information as close to the vest as possible.  However, even though some pieces of the material which Russell bundled up and sent to himself as "Stuff" might not be secret, taken together they comprised a package uniquely useful to someone, like Dennis, who wanted to compete successfully with Kemper in the Denver market.

Kemper also established that it has made reasonable efforts to maintain the confidentiality of this information by password-protecting it in electronic form and by binding its employees to confidentiality agreements.

**2.**     **Irreparable injury:**

Defendant argues that Plaintiff has proved only past harm which could be compensated by an eventual damages award and not a threat of future harm.  However,

> In actions to enforce covenants not to compete, Ohio courts have held that an actual threat of harm exists when an employee possesses knowledge of an employer's trade secrets and begins working in a position that causes him or her to compete directly with the former employer or the product line that the employee formerly supported. n19 Although the courts do not refer to this evidentiary proposition as "inevitable use" or "inevitable disclosure," the concepts are the same. According to the inevitable-disclosure rule, a threat of harm warranting injunctive relief can be shown by facts establishing that

9

> an employee with detailed and comprehensive knowledge of an employer's trade secrets and confidential information has begun employment with a competitor of the former employer in a position that is substantially similar to the position held during the former employment

*Procter &Gamble v. Stoneham,* 140 Ohio App. 3d 260, 274, 747 N.E. 2d 268, 278-79 (Ohio App. 1st Dist 2000). While there is no general covenant not to compete in this case, the harm analysis is the same. Furthermore, Russell's employment agreement binds him not to solicit Kemper employees and he agreed in the employment agreement that a damages remedy was insufficient and that injunctive relief would be appropriate in the event of breach. The evidence at the hearing showed that Russell's efforts to solicit employees of Kemper could well be ongoing and difficult to establish. For example, he asked the Court to believe that Joshua Back, a former Kemper employee, who just happens to hang out all day in Russell's office at Bankers Denver and to be listed on the appointments calendar for that office is not really working for Bankers.

**3.    Balance of harms:**

While a preliminary injunction will prevent Russell from reaping the benefit of his bargain with Dennis, the relief which Plaintiff has requested and the Court is prepared to grant will not prevent Russell from earning an honest living, even if he decides to stay in the mortgage broker industry.

**4.    The Public Interest:**

It is difficult to say whether the public generally would benefit from enhanced competition in the mortgage broker industry. It is sufficiently notorious to permit judicial notice that foreclosure cases are clogging the Common Pleas Courts which can only be the result of overselling of mortgage

10

"programs."

What can be said with assurance is that the public will gain no benefit from unconstrained competition of the sort Mr. Russell seems determined to give. This is not the typical case of a person who has years of loyal service, is fired, and then is rendered unable to work in the only field he knows by a non-compete agreement. Rather, Mr. Russell appears to have no regard for his contractual obligations whatsoever and the public interest is well served by ordering him to comply with his promises.

In sum, Kemper has proven its entitlement to a preliminary injunction pending the outcome of this litigation, albeit not with the same breadth it seeks.

Accordingly, Defendant and all persons acting in concert with him are enjoined and restrained during the pendency of this action from:

1. Maintaining possession of Plaintiff's confidential and proprietary information and trade secrets, including but not limited to customer retention programs, customer lists and identification, customer leads, long-range business and marketing plans, business forecasts and budgetary analyses (the "Protected Information");

2. Using, revealing, reporting, publishing, disclosing or transferring Plaintiff's Protected Information, directly or indirectly, to any person, corporation, partnership or other entity, including but not limited to, Bankers;

3. Soliciting, directly or indirectly, Plaintiff's employees, agents, or independent contractors for hire by Defendant or Bankers;

4. Soliciting, directly or indirectly, Plaintiff's past, current and prospective customers;

5. Performing any services for or being employed by Bankers or Richard Dennis in the mortgage broker business in any geographic market where Kemper was engaged in that business as of December, 2005;

6. Working in the mortgage loan brokerage business in the geographic areas in which Plaintiff was engaged in that business as of December, 2005;

7. Destroying or deleting, directly or indirectly, any documents or electronically stored information, including any information stored on computers, computer hard drives, and computer disks owned or accessed by Defendant at any time, which contain any information related to Plaintiff, any of Plaintiff's past, present or prospective

11

        customers, any of Plaintiff's current or former employees, agents or independent contractors, Defendant's employment by or resignation from Plaintiff, Defendant's employment and/or ownership of Bankers and/or any information relating to Plaintiff in any way whatsoever.

        This Order is effective immediately and is supported by the bond previously posted by Plaintiff as security for the Temporary Restraining Order. This Order is binding on Defendant and his attorneys and upon those persons in active concert or participation with them who receive actual notice of the Order by personal service or otherwise.

May 4, 2006.

                                                                s/ Michael R. Merz
                                                 Chief United States Magistrate Judge